UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| NOVEMBER COLE on behalf of Th. C., Tr. C., and C.C., | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CAUSE NO. 3:17-CV-494-PPS ) |
| AMERICAN HERITAGE LIFE INSURANCE COMPANY, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff November Cole brought this ERISA action on behalf of her minor children to recover life insurance benefits under a group insurance policy purchased by her late husband, Thomas H. Cole, Sr., through his employer. Mr. Cole tragically died by suicide on January 2, 2016 and the Plaintiffs filed a claim for benefits under the group policy. Their claim was denied pursuant to the group policy's suicide exclusion.

What appears to be a fairly straightforward case is complicated by the timeline of events. Mr. Cole originally began paying into a policy offered by a different insurance company on January 1, 2014. That policy did not contain a suicide exclusion and he paid into that policy until January 1, 2016. Sometime prior to that date, Mr. Cole's employer contracted with a new insurance company to provide this particular employee benefit effective January 1, 2016. The policy of the new company, Defendant American Heritage Life Insurance Company, contained a suicide exclusion limiting the

benefit amount to the premiums paid if the insured committed suicide within 2 years of the certification date. The new policy went into effect on January 1, 2016, one day before Mr. Cole took his own life.

The issue to be decided is whether the second policy was merely an extension of the first policy or whether it stands alone. The Coles argue that the two policies should be read together and the alleged ambiguities that result should be interpreted in favor of coverage. American Heritage argues that its denial was reasonable and appropriate. It asks, why should American Heritage be held responsible under some other insurer's policy language? The parties filed cross motions for summary judgment on the issue of coverage. For the reasons discussed below, I find that American Heritage's denial of the Coles' claim pursuant to the policy's suicide exclusion was reasonable and, therefore, grant American Heritage's motion for summary judgment.

## **Background**

Thomas H. Cole, Sr. was the husband of November Cole and the father to three children. [DE 29 at 2.] Mr. Cole was an employee at Forest River, Inc. in Elkhart, Indiana. [*Id.*] Beginning on January 1, 2014, Mr. Cole enrolled in, and began paying premiums for, an optional $100,000 life insurance policy through Forest River's employee plan provided by the Lincoln National Life Insurance Company. [*Id.*] At some point in 2015, Forest River terminated its group policy with Lincoln National and purchased a group policy from American Heritage that was set to go into effect on January 1, 2016. [DE 35-2 at ¶1.]

Forest River's full-time active employees were eligible to participate in its ERISA benefit plan, including the American Heritage Group Policy. [DE 35-2 at ¶2.] American Heritage's Group Term Life Insurance Certificate explains the "Certificate Date" as "[t]he effective date of coverage under this certificate and the date from which the certificate, years, anniversaries and premium due dates are determined. The certificate date is shown on the Certificate Specifications page." [DE 35-1 at ¶9; DE 35-1 at 53.] The Certificate Specifications page for the American Heritage Group Policy states "Certificate Date: January 1, 2016." [DE 35-1 at ¶9; DE 35-1 at 51.] The Certificate also contains a "Suicide Exclusion" that explains, "[i]f the insured commits suicide, while sane or insane, within 2 years after the certificate date, the death benefits is limited to the premiums paid." [DE 35-1 at ¶11; DE 35-1 at 56.] The American Heritage Group Policy contains the same exclusion. [DE 35-1 at ¶11; DE 35-1 at 17.]

Mr. Cole died by suicide on January 2, 2016, one day after the American Heritage Group Policy's Certificate Date. [DE 35-2 at ¶12.] Mrs. Cole notified American Heritage of the death via telephone call on March 28, 2016 and, after two written requests by American Heritage, submitted a death certificate and claim form on May 4, 2016. [*Id.* at ¶¶13-15.] The death certificate reported the cause of death as a self-inflicted gunshot to the chest and the manner of death as suicide. [DE 35-2 at ¶17; DE 29 at 6.] By a letter dated May 19, 2016, American Heritage issued a denial letter to Mrs. Cole based on the Suicide Exclusion under the Group Policy and Certificate. [DE 35-2 at ¶20; DE 29 at 7.] The letter also noted that there were no premiums paid for coverage

3

under the Group Policy. [DE 35-2 at ¶20; DE 29 at 7.]

Mrs. Cole retained counsel who contacted American Heritage requesting copies of the Group Policy, Certificate, and American Heritage's coverage determinations and asking for a written articulation for any coverage denial. [DE 35-2 at ¶21; DE 29 at 7.] American Heritage sent counsel copies of the requested information and noted that if the Coles had any additional information that was not previously considered in support of their claim or would like to appeal the claim, they should send the information to the attention of the author of the letter. [DE 35-2 at ¶22; DE 29 at 7; DE 35-1 at 91.] The Coles sought reconsideration of the denial but American Heritage stuck by its initial decision of no coverage. [DE 29 at 7.]

The Coles filed this lawsuit in state court seeking a declaratory judgment against American Heritage and the matter was timely removed to this Court. The Coles eventually amended their Complaint dropping all of their state law claims and asserting only an ERISA benefit claim pursuant to 29 U.S.C. § 1132(a)(1)(B). The Parties now have moved for summary judgment on the dispositive issue in this case—coverage. The question to be answered is whether or not Mr. Cole's death by suicide is covered by the American Heritage Group Policy.

**Discussion**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the

4

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

With respect to an employee benefit plan governed by ERISA, a plaintiff may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B). In interpreting an ERISA plan, I apply general principles of contract law consistent with federal common law on ERISA claims. *See Cheney v. Standard Insurance Company*, 831 F.3d 445, 450 (7th Cir. 2016); *see also Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005) (*citing Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 704 (7th Cir. 2001)). In a case such as this one, where there are no ERISA cases squarely on point with the facts of the case, I may look to guidance in the federal common law and rely on federal and state case law discussing the relevant issues, as the Parties did in their briefs and I do below. *See Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006); *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 667 F. Supp. 2d 850, 885 (N.D. Ill. 2009).

I consider the denial of benefits *de novo* unless the plan grants the plan administrator discretionary authority to construe policy terms. *Cheney*, 831 F.3d at 849, citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here there is a

5

dispute regarding whether the American Heritage Group Policy granted discretionary authority. "[D]eferential review is exceptional, authorized only when the contracts that establish the . . . plan confer interpretive discretion in no uncertain terms." *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011). While there are no "magic words" determining the scope of judicial review of decisions to deny benefits, there must be language indicating "with the requisite if minimum clarity that a discretionary determination is envisaged." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000).

Here, the only language that American Heritage points to in support of its argument that the plan grants discretionary authority is the following:

> Proof of death must be by a certified copy of the death certificate or by other written evidence satisfactory to us. We may also require the certificate to be submitted with the proof of death.
>
> We may provide an enhancement to the minimum death benefit amount. We have sole *discretion* to declare the amount and frequency of an enhancement to the minimum death benefit.

[DE 35-1 at 12 (emphasis added).] That language does not confer interpretive discretion regarding claim denial "in no uncertain terms." Rather, it clearly relates to the decision—and only the decision—to *enhance* the death benefit amount. So American Heritage is not entitled to the more deferential standard of review, and instead I will consider the denial of benefits *de novo*.

What *do novo* review means is that "[i]n an ERISA case, the district court 'must

6

come to an independent decision on both the legal and factual issues that form the basis of the claim.'" *Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012) (quoting *Diaz v. Prudential Ins. Co. of Am.,* 499 F.3d 640, 643 (7th Cir.2007)). "[W]hether the plan administrator gave the employee a full and fair hearing or undertook a selective review of the evidence is irrelevant. In fact, 'the district courts are not reviewing anything; they are making an independent decision about the employee's entitlement to benefits.'" *Id.* Plaintiffs ultimately have the burden of proof in the case because the party seeking to enforce benefits under a policy governed by ERISA "bears the burden of proving his entitlement to contract benefits." *Ruttenberg*, 413 F.3d at 663.

This case starts and ends with the Suicide Exclusion. The existence and terms of the Suicide Exclusion are undisputed. The question before me is what is the proper commencement date of the Suicide Exclusion. The Coles argue that the Suicide Exclusion has been satisfied by virtue of Mr. Cole's prior coverage under the Lincoln National Group Policy. Specifically, they argue that the Lincoln National Group Policy, under which Mr. Cole was covered for two years, was merely converted to the American Heritage Group Policy, which covered Mr. Cole for one additional day prior to his death, meaning that Mr. Cole met the two year requirement of the American Heritage Suicide Exclusion by one day, entitling the Coles to benefits. [DE 29 at 17-18.]

The Coles rely primarily on *Commonwealth Life Ins. Co. v. Jackson*, 432 N.E.2d 1382 (Ind. App. 1982), to support their argument, but the facts of that case are

7

distinguishable. *Commonwealth* involved a conversion policy issued to an insured's adult child pursuant to provisions contained within an older group policy issued by the same insurance carrier. *Commonwealth*, 432 N.E.2d at 1383-84. The plaintiff's son exercised the conversion provision in his father's insurance policy when he turned twenty-five years old. *Id.* at 1384. Less than two years later, the plaintiff's son committed suicide. *Id.* Both policies contained a two-year suicide exclusion from the "date of issue," and the defined terms and conditions were relatively the same. *Id.* The court found that it "is clear that the second policy was dependent on the first for its existence," noting that the application form provided to the plaintiff's son was one provided for the purpose of exercising a conversion privilege, which contained no questions relating to insurability or physical examination. *Id.* at 1391. The *Commonwealth* court applied the issuance date of the original policy to serve as the suicide exclusion commencement date for the subsequent conversion policy. *Id.* at 1392 ("If the function of the short term suicide clause is merely to serve as an anti-fraud provision and not as an excluded risk of loss upon which premiums are proportionately based, then it would be only logical that where evidence of insurability is waived and where a party is led to believe he is effecting a conversion of earlier established benefits rather than purchasing an entirely new policy the suicide clause of the second policy would not be given effect.").

In conducting its analysis, the *Commonwealth* court analyzed a series of both federal and state cases on the issue of allowing the date of another insurance policy to

8

serve as the commencement date of a later-issued policy's suicide exclusionary period. The cases reaching the same result as *Commonwealth* had common factors: (1) the insurance carriers were the same; (2) the second policy was a conversion of the first; (3) the carrier for the second policy did not require evidence of insurability and/or an application for coverage; (4) the second policy was dependent on the first policy for its existence and/or the second policy was derived from terms in the first policy; (5) both policies contained a suicide exclusion; and/or (6) the terms and conditions of the second policy were substantially similar to the first policy. *Id.* at 1385-1390.

Indiana state and federal courts subsequently have addressed similar issues regarding the commencement of a suicide exclusionary period. In *First Life Assurance Co. et al. v. Counting House Bank*, 523 N.E.2d 437 (Ind. App. 1988), the court was faced with the question of when a suicide exclusionary period commences when policies by more than one insurer are involved, distinguishing *Commonwealth* because it involved a policy renewal or new policy substantially similar to the original. That case involved a credit life insurance situation where a series of policies were issued at six-month intervals. *First Life*, 523 N.E.2d at 437-438. The beneficiary argued that a suicide exclusion did not apply because the date of insurance of one of the former policies, issued, by a different insurance company, should be the date commencing the suicide exclusionary period. *Id.* at 438. The *First Life* court rejected this argument and held that where there are two separate insurance policies, issued by two separate insurance companies, any exclusionary period commences on the effective date of the policy in

effect at the time of the insured's death and is not backdated to the effective date of a previous, albeit similar, policy. *Id.* at 438-439.

In *Pekin Life Ins. Co. v. Kopitzke*, 832 F. Supp. 2d 976 (S.D. Ind. 2011), the court analyzed when the suicide exclusionary period began to run when the insured had purchased two separate yet consecutive life insurance policies with the same insurance company, Pekin Life Insurance Company. The Pekin Life Insurance Company issued a life insurance policy to the insured in 1999 that contained a two year suicide exclusion. *Pekin*, 832 F. Supp. 2d at 978. Because the premiums in the 1999 policy were scheduled to increase in May 2009, the insured applied for a new term policy to avoid the increase in premium. *Id.* The new policy was issued by Pekin in 2008. Although the 2008 policy was issued by the same carrier, the insured submitted a new application, named different beneficiaries, set different annual premiums, and his application went through an underwriting process. *Id.* The 2008 policy also had a suicide exclusion that limited benefits to the premiums paid under that policy. *Id.* The 2008 policy took effect on August 11, 2008 and the insured took his own life on January 23, 2009 and, as a result, Pekin denied the beneficiaries' claims for full value of the policy proceeds. *Id.* at 978-979. The beneficiaries argued that the exclusionary period for the suicide exclusion began on the 1999 policy's effective date because the 2008 policy was merely a continuation of the 1999 policy, meaning that the suicide exclusion did not apply.

The *Pekin* court applied the same rationale as the *First Life* court, noting that: (1) the case did not involve a conversion policy, but an entirely new term policy; (2) Pekin

10

did not waive evidence of insurability issuing the 2008 policy, requiring the insured to submit an entirely new application and complete a medical examination to obtain the policy; and (3) there was nothing in the 1999 policy that compelled or obligated Pekin to issue the 2008 policy, that is, the policies were not dependent on one another. *Id.* at 983. The court ultimately concluded that all of those factors indicated that the parties did not intend for the 2008 policy to be a continuation of the 1999 policy and instead was a new, separate contract of insurance which, as a result, re-started the time period for the suicide provision upon the issuance of the new, 2008 policy, meaning that the suicide exclusion applied. *Id.* at 983-984 ("To find that the mere similarity of the policies' terms alone is enough to constitute "substantial similarity" such that the Court must find that the second policy is a continuation of the first under the *Jackson* analysis would lead to absurd results, as insurance companies would have to drastically change their insurance policy offerings to repeat customers—even if they are purchasing the same type of policy coverage—in order to avoid a finding that all subsequent policies are continuations of the previous one.")

Consideration of the factors analyzed in *Commonwealth* and the cases that follow results in the conclusion that the American Heritage Group Policy was sufficiently distinct from the Lincoln National Group Policy such that the date of the commencement of the suicide exclusion under the American Heritage Group Policy is the effective date of that policy. Here, the Lincoln National Group Policy and the American Heritage Group Policy are separate policies making no reference to one

11

another, issued by two different insurance companies, like the policies in *First Life*. The issuance of coverage under the American Heritage Group Policy had no bearing on whether the insured had prior coverage under the Lincoln National Group Policy and is not a conversion policy, like the policies in *First Life* and *Pekin*. Furthermore, the insured had to complete an "Enrollment and Evidence of Insurability Form" for the American Heritage Group Policy, which contained questions regarding the insurability of the insured, DE 35-1 at 28, like the insured in *Pekin*. Finally, the policies have different terms, most notably, the absence of a suicide exclusion in the Lincoln National Group Policy. *See, e.g.*, *The Wellinger Family Tr. 1998 v. Hartford Life & Accident Ins. Co.*, No. 11-CV-2568-CMA-BNB, 2013 WL 5339160, at *1 (D. Colo. Sept. 24, 2013) (holding that the suicide exclusion period began on the effective date of the second of two consecutively issued policies because, most importantly, the second policy included a suicide exclusion while the first policy did not and, therefore, constituted a new and different policy from the first policy); *Binkley v. Manufacturers Life Ins. Co.*, 471 F.2d 889, 892 (10th Cir. 1973) (finding that the terms of an individual policy converted from a group policy were separate, with only the second policy containing a suicide exclusion and, therefore, the second policy's suicide exclusion ran from the date of the issuance of the second policy, thus barring the claim for benefits).

Accordingly, because the effective date of the American Heritage Group Policy was January 1, 2016 and Mr. Cole took his life on January 2, 2016, the Coles' claim for benefits under the American Heritage Group Policy was properly denied pursuant to

the Suicide Exclusion. As such, American Heritage's motion for summary judgment will be granted and the Coles' motion for partial summary judgment will be denied.

## Conclusion

For the foregoing reasons, Defendant American Heritage Insurance Company's motion for summary judgment, DE 35, is **GRANTED** and Plaintiffs' motion for partial summary judgment, DE 28, is **DENIED**. The Clerk is **DIRECTED** to enter judgment in favor of American Heritage Insurance Company. The Clerk shall treat this civil action as **TERMINATED**.

**SO ORDERED.**

Entered: April 18, 2017

                                               s/Philip P. Simon
                                               PHILIP P. SIMON, JUDGE
                                               UNITED STATES DISTRICT COURT